# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| JEREMY DWAYNE NAISH, ) | |
| ) | |
| CLAIMANT, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:17-CV-2096-KOB |
| ) | |
| ) | |
| NANCY A. BERRYHILL, ) | |
| ACTING COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| RESPONDENT. ) | |
| ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On December 3, 2014, the claimant, Jeremy Dwayne Naish, protectively applied for disability and disability insurance benefits under Title II of the Social Security Act, as well as supplemental security income under Title XVI, because of tendonitis in the right Achilles tendon, reflex sympathetic dystrophy, obesity, panic disorder with agoraphobia, post-traumatic stress disorder, and major depressive disorder. The Commissioner denied the claims on April 29, 2015. The claimant timely requested a hearing before an Administrative Law Judge, who held a hearing on February 1, 2017. (R. 35; Doc. 1).

In a decision dated March 16, 2017, the ALJ found the claimant not disabled within the meaning of the Social Security Act and, therefore, ineligible for disability, disability insurance benefits, and supplemental security income. The claimant filed a timely request for review of the

ALJ's decision by the Appeals Council on March 28, 2017 and submitted new evidence of knee and low back pain to it. (R. 10–26).

The Appeals Council denied the claimant's request for review on October 26, 2017, indicating that the new evidence submitted by the claimant on June 20, 2017 did not relate to the period at issue. Thus, the ALJ's decision became the final decision of the Commissioner. (R. 32–48, 6, 9–29, 1–4).

The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court REVERSES AND REMANDS the decision of the Commissioner because the Appeals Council erred when it declined to review the claimant's new evidence.

## II. ISSUE PRESENTED[1]

The issue before the court is whether the Appeals Council erred by declining to evaluate the claimant's new, chronologically relevant, and material evidence.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the ALJ applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal claims." *Walker*, 826 F.2d at 999. This court does not review the ALJ's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial

---

[1] The claimant also argues that the ALJ improperly determined the claimant's residual functional capacity, but the court will not address this issue because it will reverse on the issue in this section.

evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity (RFC), and the application of vocational factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is entitled to Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

IV. LEGAL STANDARD

The issue upon which the court will reverse the Commissioner's decision in this case involves evidence submitted by the claimant to the Appeals Council after the ALJ's decision.

Generally, a claimant may present new evidence at each stage of the administrative process. *Washington v. Comm'r of Soc. Sec. Admin.*, 806 F.3d 1317, 1320 (11th Cir. 2015). The Appeals Council has the discretion to not review the ALJ's denial of benefits. *See* 20 C.F.R. § 416.1470(b). But, in making its decision whether to review the ALJ's decision, the Appeals Council "must consider new, material, and chronologically relevant evidence" that the claimant submits. *Hargress v. Soc. Sec. Admin.*, 874 F.3d 1284, 1290–91 (11th Cir. 2017); *Washington*, 806 F.3d at 1320.

Evidence is material if a reasonable possibility exists that it would change the administrative result. *Washington*, 806 F.3d at 1321. Evidence is chronologically relevant if "it relates to the period on or before the date of the [ALJ] hearing decision." *Hargress*, 874 F.3d at 1291. Medical opinions based on treatment occurring after the date of the ALJ's decision may still be chronologically relevant if the records upon which the doctor bases his opinion relate to the period on or before the date of the ALJ's decision. *See Washington*, 806 F.3d at 1323. The claimant can show that a medical opinion dated after the ALJ's decision is chronologically relevant if it is based on a "review of the claimant's medical history and [his] report of symptoms during the relevant time period and there was no evidence of a decline in [his] condition since the ALJ's decision." *Ashley v. Comm'r of Soc. Sec. Admin.*, 707 F. App'x 939, 944 (11th Cir. 2017) (citing *Washington*, 806 F.3d at 1322–23); *see also Hargress*, 874 F.3d at 1291 (discussing *Washington*, 806 F.3d at 1319, 1322–23).

This court has the authority to remand a case based on such new, material, and chronologically relevant evidence pursuant to 42 U.S.C. §405(g) under a sentence four remand or reversal. *See* 20 C.F.R. §§ 404.940, 404.946. "To obtain a sentence four remand, the claimant

4

must show that, in light of the new evidence submitted to the Appeals Council, the ALJ's decision to deny benefits is not supported by substantial evidence in the record as a whole." *Hearn v. Soc. Sec. Admin.*, 619 F. App'x 892, 894 (11th Cir. 2015) (citing *Ingram v. Comm'r Soc. Sec. Admin.*, 496 F.3d 1253, 1266–67 (11th Cir. 2007)). When the evidence submitted to the Appeals Council "undermine[s] the substantial evidence supporting the ALJ's decision," the Appeals Council errs in failing to review the ALJ's decision. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 785 (11th Cir. 2014). "The Appeals Council must grant the petition for review if the ALJ's 'action, findings, or conclusion is contrary to the weight of the evidence,' including the new evidence." *Hargress*, 874 F.3d at 1291 (citing *Ingram*, 496 F.3d at 1261).

## V. FACTS

The claimant was thirty-six years of age and weighed slightly more than 300 pounds at the time of the ALJ's final decision; had completed high school; has past relevant work as a corrections officer, head corrections officer, manager of fast food service, and tool repair clerk; and alleges disability based on tendonitis of the right Achilles tendon, reflex sympathetic dystrophy, obesity, panic disorder with agoraphobia, post-traumatic stress disorder, major depressive disorder, and back pain. (R. 59–63, 68–71, 10–26; Doc. 1).

*Evidence of Physical and Mental Impairments in the Record Before the ALJ*

On November 6, 2009, after the claimant failed a comprehensive course of conservative therapy including a boot, nonsteroidal anti-inflammatories, and stretching exercises, Dr. William Krauss performed surgery on the claimant to repair his Achilles tendon. The procedure included a right Achilles tendon debridement, right Strayer procedure, excision of Haglund's deformity, and detachment and reattachment of the right Achilles tendon. (R. 329).

5

The claimant presented to Southlake Orthopaedics after experiencing prolonged burning, aching, and stabbing pain in his hand on February 1, 2013. He underwent various tests which showed electrophysiologic changes consistent with bilateral carpal tunnel syndrome. Dr. Ekkehard Bonatz eventually recommended surgery to alleviate the claimant's pain, but he declined because of a high deductible. (R. 623–25).

On November 24, 2014, the claimant returned to Southlake Orthopaedics complaining of severe burning, aching, sharp, and throbbing pain in his right ankle. The claimant reported that he felt a pop in his ankle while walking up the stairs. He noted that the pain is aggravated by standing and walking and that he often wakes from his sleep because of it. He also mentioned an associated history of swelling, bruising, and range-of-movement limitations. Dr. Kraus diagnosed the claimant with a fractured osteophyte at the insertion of the Achilles tendon and placed him in a medical boot. The claimant returned six weeks later complaining that his symptoms had not improved. On January 16, 2015, Dr. Kraus performed a second surgery on the claimant's right Achilles tendon. The procedure included a right open Achilles tendon debridement with reattachment, right Strayer procedure, and excision of Haglund's deformity. Eight weeks after surgery, the claimant reported doing much better and having significantly less pain. (R. 636–60).

The claimant's mother, Mary Frances Britton, completed a Third-Party Function Report on February 1, 2015. Ms. Britton indicated that the claimant cannot sleep throughout the night because of discomfort; cannot prepare a full meal; cannot do yardwork; cannot drive; cannot put pressure on his right foot; and cannot walk without crutches. Notably, because she lives in a different state, Ms. Britton indicated that she spends no time with the claimant. (R. 233–40).

6

On April 6, 2015, Dr. James Colvard evaluated the claimant at Brookwood Primary Care Network. During the evaluation, the claimant mentioned that he was considering applying for disability. Dr. Colvard recommended that the claimant could likely work at a desk job but should discuss clearance with an orthopedic doctor. (R. 406).

At the request of the Disability Determination Service, Dr. Justin Hutto completed a consultative medical examination of the claimant on April 11, 2015. Dr. Hutto's examination of the claimant showed he is able to get out of a chair and on and off the examination table without difficulty; walks with difficulty but is not in need of an assistive device; can squat to the floor and recover; can bend over and touch his toes; cannot walk on his toes or heels; and has difficulty doing the tandem heel walk. The claimant had weakness in his right leg and moderate swelling and bruising over his surgical scar on his right Achilles tendon. He also had significant tenderness to mild palpation and limited range of movement. (R. 391–95).

Dr. Hutto noted that the claimant indicated he quit his last job and is unemployed; can feed himself; can walk very short distances on level ground; has difficulty standing for 0–5 minutes; has difficulty lifting more than 10–25 pounds with his right arm; is able to drive his car for no more than 30–60 minutes; and cannot sweep, mop, vacuum, or clean dishes for more than 0–5 minutes at a time. The claimant also indicated that he cannot climb stairs, shop for groceries, or mow the lawn, but he is able to work on his race car. Dr. Hutto's impressions were that the claimant has limitations in standing, walking, reaching, handling, or grasping but is able to ambulate, albeit with difficulty, and is able to stand or walk for more than 2/3 of an eight-hour work day. (R. 391–395).

The claimant returned to Southlake Orthopaedics for a post-surgery follow-up appointment on April 14, 2015 and reported muscular weakness, tingling and numbness, and loss of balance. He also complained of pain and discoloration around his right ankle, difficulty sleeping with an inability to tolerate a sheet touching his foot, and an inability to wear a shoe. Dr. Krauss noted that he suspected the claimant had developed reflex sympathetic dystrophy in his right foot. (R. 829). When the claimant returned to Southlake Orthopaedics for another follow-up appointment on September 15, 2015, his status was unchanged, and Dr. Krauss recommended sympathetic blocks, but the claimant was not ready to proceed with the blocks. (R. 829, 667).

State agency mental consultant Dr. Roger Estock evaluated the claimant on April 24, 2015 and noted that he has a history of anxiety for which he takes medication. Dr. Estock indicated that, although the claimant's file does not establish any severe mental limitations, the claimant's anxiety worsened after his second Achilles tendon surgery. (R. 100).

On September 21, 2015, Dr. Timothy Stone performed a psychiatric evaluation on the claimant at Chilton Shelby Mental Health Center. The claimant's current Global Assessment of Functioning Scale ("GAF") score at the time was 51–55, indicating he has moderate difficulty in functioning. The claimant reported to Dr. Stone that he was experiencing nightmares related to traumatic events, flashbacks, "disconnection" from reality, severe problems with sleep, difficulty being in crowds, hypervigilance, and avoidant behaviors. Dr. Stone diagnosed post-traumatic stress disorder, panic disorder with agoraphobia, and major depressive disorder. He increased the claimant's citalopram dosage, continued his Xanax prescription, and added Prazosin to help with the nightmares. The claimant continued seeking treatment at Chilton Shelby Mental Health Center on approximately a monthly basis for the next fifteen months. During this time, the

claimant reported that taking walks and going to the shooting range help him cope with his symptoms. He also noted that he is able to go to Wal-Mart and church services. (R. 579–610, 678–701).

On March 14, 2016, the claimant again visited Dr. Krauss and complained of burning, sharp, throbbing, and constant pain in his right foot after twisting it while walking. The claimant reported that his pain is aggravated by certain movements and is not alleviated by rest. Dr. Krauss placed the claimant in a post-operative shoe and referred him to Dr. Marion Sovic for pain management treatment. On April 19, 2016, Dr. Sovic concluded that the claimant suffers from neuralgia and neuritis, so he prescribed Neurontin and Tylenol/Codeine #3 tablets to the claimant. (R. 668, 445).

Later in April, Dr. Colvard wrote the claimant a prescription for a cane and completed paperwork for him to get Disability Access Parking Privileges. On the paperwork, Dr. Colvard indicated that the claimant has a disability and a long-term limitation or impairment on his ability to walk. He also indicated that the claimant cannot walk without an assistive device. (R. 448–49).

On August 12, 2016, the claimant returned to Dr. Sovic complaining of low back pain. Dr. Sovic concluded that the claimant has radiculopathy, site unspecified, and administered a lumbar epidural in the claimant's back. During a follow-up appointment on September 12, 2016, the claimant reported pain in his low back and right foot and indicated that the epidural was not very effective. On December 16, 2016, the claimant reported a pain score of 5/10 with pain in his lumbar spine and right foot. Dr. Sovic's assessment of radiculopathy remained unchanged, so he continued the claimant on the Neurontin and Tylenol/Codeine #3 tablets. (R. 706–10).

9

On December 8, 2016, Dr. Ricardo Colberg evaluated the claimant at Andrews Sports Medicine and Orthopaedic Center. The claimant reported constant pain, which consists of severe aching and burning in his right foot. He noted that nothing gives him relief from the pain. He also told Dr. Colberg that his left foot was beginning to hurt because he must compensate for the pain in his right foot when he walks. After identifying significant weakness and mild swelling in the claimant's right foot, Dr. Colberg diagnosed chronic bilateral foot pain in both of the claimant's feet and recommended physical therapy and desensitization techniques as well as medication management. Dr. Colberg also ordered an MRI of the claimant's right ankle and foot. (R. 725–26).

On December 14, 2016, an MRI on the claimant's right ankle and foot showed normal results except for fluid surrounding the peroneal tendon, but the tendon was intact; mild attenuation, which could be tendinosis, but not a definite tear; mild degenerative change in the great toe MTP joint; and trace subcutaneous edema surrounding the fifth toe, but neither bone marrow edema nor an acute fracture were present. (R. 735–36).

*ALJ Hearing*

At the ALJ hearing on February 1, 2017, the claimant testified that he needed a second surgery on his Achilles tendon after it "broke loose" while he was running. He stated that he subsequently sought other employment opportunities, but no employer wanted to hire him. (R. 62).

The claimant testified that his right foot often swells and turns red and purple, and he tries to elevate it "34 inches or more" as much as possible. He stated that because of the swelling he cannot wear regular shoes and instead must wear flip-flops. For his wedding, he wore closed-

toe shoes that were four sizes larger than his regular shoe-size. He testified that "[b]y the end of the wedding, it took three people to help me get that shoe off my foot." The claimant also stated that his foot will swell and "fall asleep" if he is sitting for an extended period, sometimes less than thirty minutes. He testified that he uses his cane as much as possible at home, but he cannot navigate stairs without getting down on his knees or going down one leg at a time. (R. 71–74).

The claimant stated that he has pain every day. On a pain scale of one to ten, he experiences a "consistent four to five" that can increase if he has been on his feet for a while. If he takes a misplaced step and does not have his cane, he stated that the pain can "take your breath away." To manage the pain, the claimant testified that he received a pain block in his back, but "nothing happened with it," so he takes Oxycodone three times per day. (R. 75–76).

Regarding his mental disorders, the claimant testified that his post-traumatic stress disorder is influenced by his former employment as a corrections officer. He also stated that he has panic attacks when he is near a crowd, so he takes Xanax to reduce his anxiety. The claimant further testified that he has trouble sleeping and concentrating. (R. 78–80).

The claimant stated that his back will "lock up" because he is "favoring the other leg." The ALJ asked the claimant if he has pain in his back, and the claimant responded, "Oh, my back's killing me. My back's been killing me for a while now." He stated that the pain in his back "can take my breath away." (R. 80).

The vocational expert, Mike Head, listed the claimant's past relevant work as a corrections officer, head correction officer, manager of fast food service, and tool repair clerk. In his first hypothetical, the ALJ asked Mr. Head to assume an individual of the claimant's age, education, and work experience who could perform sedentary work with the following

limitations: cannot use foot controls on the right-hand side; cannot climb ladders, ropes, or scaffolds; cannot do commercial driving or be exposed to unprotected heights or hazardous and moving machinery; climbing ramps and stairs is limited to occasional; balancing and ambulation requires a single-point cane; interaction with coworkers, supervisors, and the general public is limited to occasional; and changes and/or decision-making in the workplace is limited to occasional. Mr. Head responded that the individual could not perform the claimant's past relevant work but could work as a bench hand, which has 58,000 jobs available nationally and 1,150 in Alabama; assembler, which has 52,000 jobs available nationally and 950 in Alabama; or surveillance system monitor, which has 68,000 jobs available nationally and 1,300 in Alabama. (R. 86–88).

For these sedentary jobs, Mr. Head testified that a ten to fifteen minute rest break every two hours might be acceptable but would be "pushing it," as the employee would need to be on task for the majority of the day. He also stated that none of these jobs would tolerate elevation of one's foot above waist level throughout the workday. He further testified that these jobs would not allow more than twenty days of absence per year or more than two days of absence per month for an extended period of several months. (R. 88–90).

*ALJ Decision*

The ALJ rendered an unfavorable decision for the claimant on March 16, 2017. The ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2018 and had not engaged in substantial gainful activity since June 27, 2013, the alleged onset date. (R. 37).

The ALJ determined that the claimant has the severe impairments of tendonitis of the right Achilles tendon, reflex sympathetic dystrophy, obesity, panic disorder with agoraphobia, post-traumatic stress disorder, and major depressive disorder. The ALJ found these impairments to be severe as defined under the Social Security Act. The ALJ also identified carpal-tunnel syndrome as a non-severe impairment because it has no more than a minimal effect on the claimant's ability to perform basic work activities. (R. 37–38).

Next, the ALJ found that the claimant did not have an impairment or combination of impairments that met or medically equaled a Listing. In making this determination, the ALJ assessed the claimant under Listing 1.02 pertaining to joint pain, stiffness, and deformity, but concluded that the evidence fails to establish gross anatomical deformity or findings of joint space narrowing, bony destruction, or ankylosis of the affected joint, or that that the claimant has an inability to ambulate effectively. The ALJ also found that the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of Listings 12.04, 12.06, and 12.15. (R. 38–39).

The ALJ found that, after considering all the evidence, the claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms; however, the ALJ concluded that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not consistent with the medical evidence and other evidence in the record. (R. 41).

The ALJ cited the claimant's consultative examination with Dr. Hutto, in which the claimant was able to get out of a chair; get on and off the examination table without difficulty; walk without an assistive device; squat to the floor and recover; and bend over and touch his

toes. The ALJ emphasized that only a few days after this examination the claimant reported significantly more severe symptoms such as the inability to tolerate a sheet touching his foot and the inability to wear a shoe. (R. 42).

The ALJ also cited the claimant's pain management treatment with Dr. Sovic, in which the claimant reported a 5/10 pain level. The ALJ indicated that this report was inconsistent with the claimant's complaints of severe aching and burning pain in his right foot during an evaluation with Dr. Colberg two days later. Further, the ALJ noted that the claimant reported pain in his left foot from overuse, "a relatively new complaint that the claimant had reported for the first time in November 2016." He also cited the claimant's ability to work on a race car, take walks, and go to the shooting range as "inconsistent with his allegations of debilitating pain." (R. 44).

Regarding medical opinion evidence, the ALJ assigned only "some weight" to the opinion of the consulting, examining physician Dr. Hutto that the claimant could stand continuously in an eight-hour work day because Dr. Hutto did not "adequately consider the effect of pain on the claimant's ability to stand and/or walk throughout an eight-hour day." The ALJ noted that, because of the claimant's pain, gait abnormality, and obesity, sedentary work is more appropriate. (R. 42).

The ALJ assigned "limited weight" to the opinion of the claimant's primary care provider Dr. Colvard in April 2016 that the claimant cannot walk without an assistive device and has a long-term disability because the opinion "was made for the purpose of the claimant obtaining a parking permit and the meaning of 'long-term disability' is undefined on the application." The ALJ also indicated that such an opinion is reserved for the Commissioner of the Social Security

Administration and can never be entitled to controlling weight. For the same reason, the ALJ declined to give controlling weight to Dr. Colvard's opinion from a year earlier that the claimant was able to work and could find a desk job that does not cause problems with his ankle. (R. 44).

The ALJ also considered a Third-Party Function Report completed by the claimant's mother regarding the severity of the claimant's impairments and limitations on his ability to function. The ALJ gave the evidence "only some weight" because the claimant's mother lives in another state; does not spend much time with the claimant; and completed the report shortly after the claimant underwent surgery. (R. 46).

Concerning the claimant's mental health impairments, the ALJ noted that the claimant takes medication for anxiety and depression, but his conditions worsened after he began to experience pain in his right ankle. The ALJ mentioned the claimant's treatment at Chilton Shelby Mental Health Center where he reported agoraphobia in crowds, but the ALJ also noted that the claimant "was able to do activities such as attend church, hang out at the shooting range, and go to Wal-Mart—although he reported it was stressful to go to Wal-Mart if he did not take Xanax." The ALJ also noted that the Chilton Shelby records do not document the claimant having any difficulty interacting with health center employees. (R. 45).

Regarding opinion evidence related to the claimant's mental impairments, the ALJ gave "little weight" to the opinion of state agency mental consultant Dr. Estock because "subsequent evidence supports greater limitations." The ALJ also mentioned that the claimant's counselors assigned him a GAF score of 60, indicating that the claimant has moderate symptoms or moderate difficulty in social, occupational, or school functioning. The ALJ assigned "only some

weight" to the GAF score because the raters assigned the score during an initial evaluation of the claimant and had only limited familiarity with him at the time. (R. 45).

After considering the entire record, the ALJ determined that the claimant has the residual functional capacity to perform sedentary work, except that he has the following exertional and non-exertional limitations: he cannot use foot controls on the right side; cannot climb ladders, ropes, or scaffolds; cannot tolerate exposure to unprotected heights or hazardous and moving machinery; cannot perform commercial driving; can occasionally climb ramps and stairs; can balance and ambulate with a single-point cane; can occasionally interact with coworkers, supervisors, and the general public; and can occasionally tolerate changes and/or decision-making in the workplace. (R. 41).

Based on the claimant's age, education, work experience, residual functional capacity, and the vocational expert's testimony, the ALJ determined that the claimant cannot perform his past relevant work. However, the ALJ found that other work exists in significant numbers in the national economy that the claimant can perform, including employment as a bench and table worker, assembler, or surveillance system monitor. Therefore, the ALJ determined that the claimant is not disabled under the Social Security Act. (R. 46–47).

*Additional Evidence Submitted to Appeals Council*

After the ALJ rendered his decision on March 16, 2017, the claimant submitted additional evidence to the Appeals Council to support his claim for disability. The new evidence included records from Dr. Charlie Talbert of Southlake Orthopaedics dating from April 19 through May 12, 2017. On April 19, the claimant reported to Dr. Talbert a three-month history of

burning, sharp, aching, dull, and stabbing pain in his midline back as well as "very severe lower back pain and difficulty sleeping and walking." (R. 12).

Dr. Talbert ordered an MRI and total-body scan for the claimant. The MRI showed broad-based disc bulging at the L4-L5 and L5-S1 levels, and the total-body scan revealed arthritic changes in the right foot, bilateral knee degenerative changes with the possibility of bilateral knee hemi-prostheses, and a mild compression injury at the T-12 vertebral body with mild edema. Dr. Talbert diagnosed the claimant with cervicalgia; degenerative disc disease, cervical; degenerative disc disease, lumbar; lumbago (low back pain); and regional pain syndrome involving the lower right extremity. (R. 10–26).

Dr. Talbert also noted that the claimant "has a limp and uses a crutch because of that. His limp probably does not help his lower back." Further, Dr. Talbert opined that the claimant's problem areas in his knees "may be compatible with the stress reaction in the way he is walking." (R. 19–24).

On October 26, 2017, the Appeals Council declined to review the new evidence presented to it because the evidence "does not relate to the period at issue." (R. 1–4).

## VI. DISCUSSION

The claimant argues that the Appeals Council committed reversible error by declining to evaluate the claimant's additional medical evidence submitted after the ALJ's decision. The court agrees and finds that the Appeals Council committed reversible error in declining to review the ALJ's decision in light of the claimant's new, chronologically relevant, and material evidence.

In determining whether to review the ALJ's decision, the Appeals Council must consider any new, chronologically relevant, and material evidence submitted after the ALJ's decision. *Washington*, 806 F.3d at 1320. Chronologically relevant evidence relates back to issues that were present during the alleged disability period, rather than demonstrating a condition that has arisen since the ALJ's decision; material evidence creates a reasonable possibility that the evidence could change the ALJ's administrative result. *Id.* at 1321; *Belyeu*, 2015 WL 1490115, at *5.

The court finds that the Appeals Council did not properly evaluate whether the newly submitted evidence was chronologically relevant or material. When Dr. Talbert evaluated the claimant five weeks after the ALJ's unfavorable decision on March 16, 2017, an MRI revealed broad-based disc bulging at the L4-L5 and L5-S1 levels. Dr. Talbert diagnosed the claimant with cervicalgia; degenerative disc disease, cervical; degenerative disc disease, lumbar; lumbago (low back pain); and regional pain syndrome involving the lower right extremity. The claimant also complained of a three-month history of burning, sharp, aching, dull, and stabbing pain in his midline back as well as "very severe lower back pain and difficulty sleeping and walking."

The claimant's complaints and diagnoses relate back to his pain management treatment on August 12, 2016 when he returned to Dr. Sovic complaining of low back pain—all before the ALJ's decision. Dr. Sovic concluded that the claimant had radiculopathy, which includes back pain among its symptoms, and administered a lumbar epidural in the claimant's back. (R. 706–10). At his hearing with the ALJ, the claimant referred to this back pain, saying, "Oh, my back's killing me. My back's been killing me for a while now." He stated that the pain in his back "can take my breath away." (R. 80).

18

Furthermore, in the evidence presented to the Appeals Council, a total-body scan revealed arthritic changes in the right foot and bilateral knee degenerative changes with the possibility of bilateral knee hemi-prostheses. Dr. Talbert noted that the claimant "has a limp and uses a crutch because of that. His limp probably does not help his lower back." He also opined that the claimant's problem areas in his knees "may be compatible with stress reaction in the way he is walking." (R. 19–24).

These notes and Dr. Talbert's diagnosis of claimant's regional pain syndrome involving the lower right extremity relate back to the claimant's evaluation at Andrews Sports Medicine and Orthopaedic Center on December 8, 2016, in which he told Dr. Colberg that his left foot was beginning to hurt because he must compensate for the pain in his right foot when he walks. Dr. Colberg then diagnosed chronic *bilateral* foot pain in *both* of the claimant's feet (R. 725–26). Moreover, at his hearing with the ALJ, the claimant mentioned that by "favoring the other leg," his back will often "lock up." (R. 80). Because the complaints and diagnoses in the new evidence presented to the Appeals Council relate back to the claimant's original claim of back pain and its relation to his ambulatory limitations, the evidence is chronologically relevant.

Additionally, a reasonable possibility exists that this chronologically relevant evidence from Southlake Orthopaedics and Dr. Talbert may have changed the ALJ's decision that the claimant is not disabled under the Social Security Act. The ALJ mentioned that Dr. Sovic administered a lumbar epidural block for the claimant, but he never addressed the claimant's chief complaint of back pain on August 12, 2016. Instead, the ALJ indicated that the epidural block was administered solely as an attempt to address the claimant's right foot pain. If the ALJ had reviewed Dr. Talbert's diagnosis of lumbago (low back pain) and the broad-based disc

19

bulging revealed by the MRI, or the impact that the claimant's "favoring" of his leg has on his back, he may have reached a different conclusion. A reasonable possibility exists that the evidence from Southlake Orthopaedics and Dr. Talbert may have altered the ALJ's findings of the claimant's limitations, or at least, altered the hypothetical he posed to the vocational expert.

The records from Southlake Orthopaedics and Dr. Talbert are new, but chronologically relevant and material. The Appeals Council erred in failing to remand the case to the ALJ based on this evidence.

## VII. CONCLUSION

For the reasons stated above, this court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED.

The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 21st day of March, 2019.

_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE